I'd like to reserve five minutes for a bubble. Mr. Renzi is seeking a judgment of acquittal or in the alternative a new trial. Oh, Mr. Himmelfarb, would you identify yourself just for the record? Sure, I'm Dan Himmelfarb from Mayor Brown. I'm representing defendant Renzi in the case. Mr. Renzi is seeking a judgment of acquittal or in the alternative a new trial on three sets of charges. Public corruption, insurance, and racketeering. I'm going to begin with the public corruption charges. Our principal submission is that Mr. Renzi is entitled to a judgment of acquittal because the government did not and could not prove that Mr. Renzi obtained a thing of value, which is an essential element of the charges. Our fallback position is that Mr. Renzi is entitled to a new trial on those charges, first because of the substantial risk that the thing of value found by the jury differs from the thing of value found by the grand jury. Now, the government always has, the government alleges that they always argued that the thing of value was money paid to Sanlin, part of which was daughter Renzi. And I'm wondering, do you agree that this has been the government's consistent position or what's your, what do you say about that? What they point, the language in the indictment that they point to is actually even more general than that. It's that Sanlin was enriched, that Renzi enriched Sanlin and personally benefited himself. Now, the government's position is that what that means as a practical matter and what their theory was throughout the trial was that the money paid by Ares to Sanlin for the Sanlin property, $4.5 million, and then the $200,000 that was paid by Sanlin to Renzi is the thing of value. Whether that means they're both a thing of value or one of them is the thing of value, that is the government's position. But tellingly, it seems to us, when you read their appellate brief, in the section of the brief in which they're defending the verdict against the sufficiency of the evidence challenge, they introduced a host of new possible theories. Their first position, of course, is that you don't have to prove anything more than an extortion and bribery. All you have to show is what I just described, the $4.5 million transfer and the $200,000 transfer. But then they argue as a fallback position, even if we did have to prove more than an equal value exchange, there are all these different ways in which a jury could find that on the trial record in this case. And it's our submission that virtually all of those theories, certainly some of them, differ in a material way from what I just described as their theory at trial. Well, I thought the theory was essentially a quid pro quo, no property, no bill. So that the extortion was complete when the property sale was tied to the promise of a future introduction of a land exchange bill. And there's no question that the property had value. Do we really need to get into this debate over whether it was $200,000 or $4.5 million or $533,000? I mean, there's no question that the government had to prove a quid pro quo, but what they also had to prove is that the thing that was exchanged for the official act was a thing of value. And what we say is that when you are giving something to an official or to a third party on behalf of an official and you're getting back something that is legitimate, services, goods, or property, you're not giving a thing of value in return for the official act. I thought the theory was that there wasn't any need to include the Sandland property. What the purchaser of the property really wanted were the surface mineral mining rights of the government land that was to be exchanged. And the testimony, I guess it was from Mr. Aries, was that had it not been for the insistence by your client that the Sandland property be part of the deal, there was no particular interest by the purchaser in that property. Isn't that it? Well, I mean, I think that's just another way of characterizing the government's first theory, which is essentially a but-for theory. Their theory is, but for the corrupt promise of some official act, this transaction would not have taken place. And what we say about that is that that perfectly describes a crime that's not a federal crime, which is called coercion. And this distinction between extortion and coercion is drawn in the last few Supreme Court cases on extortion. And they talk about how the Hobbs Act codified some aspects of this old New York law called the Field Code. And they codified extortion, which means essentially coercing somebody into parting with a thing of value. And then they did not codify, they consciously chose not to codify the lesser included offense under this old law, which is coercion. But if the testimony from the Aries group was, we would not have parted with $4.5 million, but for the insistence by Congressman Renzi that we had to acquire this property or he would not sponsor our land exchange bill for other property that we were really interested in, why isn't that extortion? Well, I think just for the reasons I've just described that you can say that Aries was coerced into parting with $4.5 million for the Sandlin property. But you can't say that Sandlin or Renzi obtained a thing of value. So is your theory that so long as in order to get the legislative act through, in other And if in order to do the legislative act, the person wanting at Aries had to buy something, as long as the requirement to buy something gave him something of equal value, then that doesn't count as extortion or bribery, is that your theory? That is our position. Okay. So there's not a case that actually directly is directly on point, is that correct? There aren't cases that are directly on point. There are some old cases in different contexts that we say support our position. The model penal code adopts a version of this theory. And we think Well, and so Judge Coleman is saying, well, if in order to get the legislative act done that you want, you have to buy something regardless of its value that you don't want and you wouldn't otherwise have bought, that falls within the definition of bribery or extortion. And so there's no case that would preclude that holding either, is that correct? There is no case in the Hobbs Act extortion context that would preclude it. But we think it's critical to note that there's no case that would allow it. We essentially laid down a challenge to the government in our opening brief and said, as far as we are aware, there is no case in the annals of, you know, reported federal decisions on the Hobbs Act, or for that matter, the bribery statute, that would allow a prosecution in this circumstance. And the government filed its brief and pointed to cases that we think quite clearly do not. So there's evidence that the, I guess the Nature Conservancy or someone testified that the land was overvalued. So there was evidence in the record that the value of it was, at the time, was not equivalent to what the ARIES group or Mr. ARIES paid for it. Is that right?  And just to sort of frame that question. Do you disagree that the Conservancy provided that testimony? I disagree that it's sufficient evidence to permit a jury verdict that there was more than an equal value exchange. And of course, this gets to the government's fallback argument, which is that even if there has to be proof of more than an equal value exchange, there was such proof here. And what the government points to is testimony by a man named Harris, who worked at the Nature Conservancy, who said that in early 2004, an appraisal was done of the property because the Nature Conservancy was considering buying it. And the critical point for purposes of our discussion right now is that there were a number of values reflected in the appraisal. One of them was for conservation use, which is, of course, what the Nature Conservancy would have used the property for. That's what it buys property for. And it was in the neighborhood of a million and a half dollars, I think. But then there was a separate valuation, which was for development use. And that number was $3.86 million. That was in February or thereabouts of 2004. The transaction occurred between Harris and Sandlin. I don't see how this makes a difference because, I mean, the land is not the same as money. So, so Harris bought land in order to get something done from the legislator. And the value of the property was, could have been more, could have been less, depends on the use, but that's really not the same as money. So he was doing this additional act in order to get the legislation he wanted passed through. Well, I mean, there has to be a thing of value exchange, a thing of value obtained either by the defendant, which in this case would be Renzi, or to a third party, by a third party at the instance of the public official defendant. And the government's theory is that... But I guess are you saying that any of the things that, I shouldn't use the word things, any of the proffers that the government argues are things of value, that none of them really are things of value? Or are you saying that if they were things of value, they didn't make the requisite, it fails on sufficiency of the evidence? I'm not quite sure. Right. Let me try to be clear about this. What I'm saying is that if you look at the government's theory at trial, which I think viewed in the light most favorable to them, although even this isn't clear, their theory at trial was the thing of value was the $4.5 million from Ares to Sandlin, in turn the $200,000 from Sandlin to Renzi. That's their theory at trial. Well, more than that, their theory at trial was the whole 733,000, but the jury didn't find... That's right. The jury acquitted on the 533, the second payment. So what we say is that that's not a thing of value because the 4.5 got in return for it property of at least that value. In fact, we think it was worth more. And the $200,000 was for a pre-existing legitimate debt. So as far as the trial theory is concerned, there's no thing of value. Now, the government has the fallback theory in their brief, which is that, well, even if you think we have to prove more than an equal value exchange, we did. And one of the arguments they made was that there was evidence that the property was actually worth less than $4.5 million, so he overpaid for it. And I just responded to that argument, but there are a bunch more, and I'm happy to address them one by one. We're not really per se stuck to... We're stuck to what the evidence shows, right, whether they made the argument or not, correct? I think that's fair, yes. But I don't think the evidence, well, as far as the sufficiency of the evidence claim goes, that may be true. As far as our variance argument goes, I think it's not true. I think the whole point of a variance is that when you indict a case on one theory and you try it on that... Well, you're noticing someone of what you're... Exactly. How you're going to argue it. And then the jury returns a verdict. You can't then say, well, maybe the thing we were urging the jury to return the verdict on the basis of is, you know, has no basis in law, but we've got all these other brand new theories. That's sort of the whole point of our variance argument. This may be getting back to the point you were making about coercion, but let's assume a hypothetical legislator says in order to sponsor this land transaction bill, land swap, you're going to have to purchase this piece of property and donate it to the Nature Conservancy. And but for that insistence, the seller or the buyer would never have purchased that piece of property. Is that a crime? If I'm understanding the hypothetical correctly, I think that would be a different case just because if you're directed to buy something and immediately part with it, you are not obtaining anything of value. Well, the thing of value that the, well, I guess that may be the answer that the quote unquote, well, the defendant doesn't obtain a thing of value, even though he has coerced using his office, the purchaser into acquiring this piece of property that it really didn't want in order to get the land exchange bill introduced. Right. I mean, in your hypothetical, if the public official says you have to buy a piece of property and the... And say donate it to the... Right. And the extorted person buys it at market value and holds on to it, that would be our case. But if there's a further direction to give it to a third party, I think you could say that person is parting with a thing of value. So if the demand had been, you must purchase this piece of property and treat it as if it is in a conservancy for environmental preservation purposes, that would, in return for sponsoring the bill, then you would agree that is extortion. I think you would have a thing of value there just because you're not getting the full value of the property. Okay. I think we understand your argument. Do you want to move on to... I would like to do that. And what I'd like to address now, if I could, is the speech or debate clause. And there are two pieces of testimony at issue which are related, both from Joanne Keene, who was the district director for RENCI. And this was... Both of these were discussions between a member of Congress and a senior staffer. Well, would you agree that the statement about him not being very excited and interested in the Resolution Copper Exchange, is that the weaker of your two arguments for speech and debate? I mean, that one seems a little weak. I'm sorry. It may well be. Yeah. It may well be. And in fairness, I think you could say the government certainly feels that way because before trial, the government conceded that the other piece of testimony, the testimony about Duke Cunningham, was, in fact, covered by the speech or debate clause. It ultimately, during the course of trial, took the position that there was a waiver. And I'll turn to that in a moment, if I can. Well, I think that's your stronger one, in my view. I haven't talked to the other panelists, but in my view, that's your stronger one. That may well be. But I think they fall in the same basic category, which is, as I say, there are conversations between a member of Congress and a senior staffer about whether to support legislation and for what reasons, either to support it or not to support it. It seems to us, whatever other disagreement there can be about the precise scope of the speech or debate clause, and I recognize that there are disagreements. Well, but let's say that it was. But what I'm struggling with as a former trial lawyer, and I would have been sitting there, it just sort of seems like that you open the door and, you know, that it's, you don't get to just say anything. You don't get to use things as a sword and a shield. And it seems that he opened the door and the, you know, the train came right on through. I mean, there are two things that are true. And that's not waiver. I mean, that's a cross-examination. I mean, the first thing is that you're absolutely right. Ordinarily, you don't get to do that. The second thing that's true is that if there's anything that's crystal clear about the speech or debate clause from the Supreme Court's decision in Hastaski is that ordinary principles of waiver, opening the door, whatever you want to call it, simply don't apply in this context. But waiver and opening the door on cross, I think, are, I think they're two different things. Waiving a privilege, you know, let's say it's an absolute privilege. Waiving that is a complete. But if you try to, you know, it's sort of like if you try to show good moral character, well, the bad's going to come in. Right. I think, respectfully, I mean, I think it's some species of a waiver argument, opening the door. Whether you call it waiver or not, it is sufficiently tied to waiver that it has to be covered by this principle in Hastaski. And what Hastaski says is we, the Supreme Court, are not even sure there can ever be a waiver. So with Hastaski, he said a lot of different things. I found it somewhat broad and not totally consistent. But it also said that the exchanges between Hastaski and the various United States attorneys indicated a willingness to waiver the protection of the Fifth Amendment. The speech or debate clause provides a separate protection which calls for at least as clear and unambiguous an expression of waiver. No such showing appears on this record. That suggests to me that a Fifth Amendment waiver potentially could be sufficient to waive the protection of the speech or debate clause. Am I reading that wrong? That's not how I read it. How I read Hastaski is that the factual setting of the case is that a member of Congress voluntarily testified before a grand jury, I think 10 times, voluntarily produced documentary evidence to the grand jury. The government's position is that that amounted to a waiver such that the speech or debate privilege could not be asserted at trial. And what the court said, I think, in the context you're referring to, was what the member did may have worked a waiver of Fifth Amendment rights. But it didn't work a waiver of speech or debate rights. The waiver has to be at least as clear. And here, he wasn't thinking of the speech or debate clause, and so he didn't waive it. But suggests that it's waivable on similar basis as the Fifth Amendment. That's what I found confusing. I mean, if anything's clear from Hastaski, I think what's clear is that the court says if there ever can be a waiver of speech or debate rights, it has to be an explicit and unequivocal waiver. And we think there's a very short answer to the government's waiver argument, which is, if the theory is that because we cross-examined the government's witnesses during the course of the government's case, we waived our speech or debate right, that is necessarily a theory of implied waiver. And by definition, that's not explicit. So your position is that this is a unique privilege which cannot be waived through opening the door at trial when the defense introduces it affirmatively on cross-examination, even though if it was an attorney-client privilege, a priest-penitent privilege, a physician-patient privilege, those are all privileges that can be forsaken through that means. That's absolutely right. That's absolutely right. If this is a unique privilege that exists, why? Because it's an express clause in the Constitution? No, because it has structural and it has a structural and institutional dimension that your standard criminal defendant protective rights that you find in the first several amendments of the Bill of Rights don't. This is not only meant to protect. In fact, it's arguably not even primarily meant to protect the defendant. What do we do with the language about legislators are not super citizens and on the language that you can't use it as both a sword and a shield? I mean, it just seems to me that if you try to rely upon it as a shield or as a sword that you cannot then erect the shield when the government comes back and says, well, you started this whole line of inquiry by cross-examining Hegner, Keene, and whatever the other fellow. I mean, I think the super citizen language was used by the Supreme Court in the context of determining whether particular conduct is covered by the clause, not in the context of waiver. I think the Supreme Court's pronouncements on waiver couldn't be clearer. As I say, waiver has to be explicit. This is a theory of implied waiver. To us, that's the beginning and the end of the analysis. The third, I see that my time is almost up. The third point on the speech of debate clause, the government's third argument, is essentially a harmless error argument, although they don't call it that. They say that if there's no effect on the outcome, there's no violation. I don't think it really matters whether you call this harmless error or something else. I think your position has to be that it's structural error, that we don't look at the magnitude of all the other evidence that the jury heard. Isn't that your position? That's right. I mean, I think that's our first position, is that just as you can't, just as ordinary waiver principles don't apply, ordinary harmless error principles don't apply. Then it would have to be structural error. That's right. But otherwise, constitutional errors are always susceptible to a harmless error. They are. Unless it involves something like denial of a jury or counsel or something like that. Right. But the standard, of course, for constitutional error is harmless beyond a reasonable doubt. So at the very least, the government would have to show that. We think it would have to show more because of the unique nature of the speech or debate error. But our basic submission on prejudice is that. But structural error, you don't have to show any of that. We don't have to show any effect on the outcome. But recall, Joanne Keene was the government's star witness. I don't think there's any question about that. They had four witnesses on their public corruption charges. Three of them were strangers to Renzi. Joanne Keene was his trusted confidant. She was telling the jury about the words he said. She was the only insider to testify about what Renzi said insofar as his motivation is concerned. As you pointed out, Judge Callahan, the Duke Cunningham testimony, I think, was sort of uniquely, powerfully prejudicial. And it's no accident that the government relied heavily on this in its summation. All of which together, whatever standard you think is the right one, whether it's harmless beyond a reasonable doubt or something more, or whether there could never be harmless error, we think that's more than adequate to require a new trial here. Some of you disagree with us on our sufficiency argument. And that's certainly true when you combine that with the three other errors, the three other trial errors which we addressed in our brief. Okay. Thank you very much. I guess we will next hear argument from Mr. O'Dashen. Am I right? How have you divided it? Are you going to go to House Mr. Kershaw next? I think that's fine. That'd be fine. Mr. Kershaw? Good afternoon, your honors. Kerry Kershaw for the amicus in this case, the bipartisan legal advisory group of the house. Let me start by thanking you for allocating time for me to appear here today. I very much appreciate it. Well, we very much appreciated your participation in the briefing. I realize it's an important issue to Congress. It is. And there are three speech or debate issues in this case that have institutional overtones for the house. Two of them concern the Joanne Keene testimony, that is whether the testimony itself, the challenged Keene testimony, whether that is in fact speech or debate protected information. The second is the waiver issue. And the third issue is the Kevin Messner testimony. The house agrees with Mr. Renzi on the first two of those. The house disagrees with Mr. Renzi on the third one. On the third one, to the extent that the Renzi argument would call for a balancing, to the extent they're making an argument that the speech or debate is anything less than absolute, on that one, we disagree. Let me start with the waiver argument, which is where Mr. Himmelfarb ended up. The waiver issue obviously concerns whether Mr. Renzi effectuated some sort of an implicit waiver by virtue of his cross-examination of Mr. Hegner and Mr. Aries. On this issue, we think Helstowski is dispositive. Helstowski makes it very clear, I think, about as clear as it could be made that the normal rules simply do not apply in this context. Well, but you can't, but there's got to be, I mean, in trials, you can't, like, give people a shield and you tie both hands, you know, just so that they can say anything and they can make themselves, and they know that they can say anything with impunity. That can't be right. Not sure that's right, Your Honor. I think Johnson is the case that you have to look at for that. In the Johnson case, Congressman Johnson was charged with bribery. That case actually went to trial. It went up on appeal after his conviction. The Supreme Court reversed the conviction. The conviction was reversed principally on the basis of the United States government's crossing, that is, the Department of Justice's cross-examination of Johnson's direct testimony out of his own mouth, in his own defense, describing the purpose for which he made the speech, which was the basis for the prosecution. He testified in his own defense. The government cross-examined him on that, and on that basis, the Supreme Court reversed the conviction. I think that answers the question of whether speech or debate is like everything else in terms of opening the door. It isn't. We suggested below that there are mechanisms, evidentiary mechanisms, by which the trial court can deal with this issue. But then congressmen are super citizens, and they get to say whatever they want, and the public would have no recourse against people that are taking bribes and doing, you know, I mean, defying the public trust. I disagree, Your Honor. I don't think that makes them super citizens. They certainly can be tried. The question is whether they can be tried with, whether they're protected from having legislative evidence used against them. So, Mr. Crutcher, under what circumstance could we declare that the privilege had been waived? If it's not waived when a current or former congressman gets up on the witness stand and opens the door by testifying about it, when, if ever, could we, would you agree that it was waived? I think you could find a waiver if a member of congress executed a document saying, I am waiving the privilege. I think you could find a privilege if a member got up on the stand and made a statement under oath that he was waiving the privilege. I think it's got to be just about that explicit in order to satisfy the Helsopowski standards. But lying doesn't subject a person to impeachment. I'm not sure I follow the question. Well, but, I mean, you're essentially saying they can, if they don't say I waive it, then they can say whatever they want. And there's nothing out there that can ever impeach them. That can't be right. You mean if they lie about their legislative activities? I mean, again, I'm not sure I'm following your question here. Well, I mean, it would allow Mr. Renzi to get any account of what he said, you know, in terms of his side of the story. And even if there were other things out there to impeach that, they can't touch it is what you're saying. Well, I think that's what Johnson is saying. I realize Renzi did not testify. But suppose Renzi had gotten on the stand and said, I never conditioned the acquisition of the Sanlum property in return for my promise to introduce future legislation. Your position would be that the government could not ask a question, did you not have a conversation with Mr. Hagner in which you said words to the effect of no Sanlum property, no bill? Well, certainly they could. Because in this court, in this case, Your Honor, this court has held that that was not legislative activity that was protected. This court has held that that's unprotected activity. So, of course, he could be cross-examined about that. Well, supposedly then testified, and I never said to anyone that I was putting the brakes on introducing or going forward on the legislation because of what was happening to Congressman Cunningham. You're saying that the government could not then cross-examine him on a conversation he had with Ms. Keene in which he said just the opposite? Yes, I think that's right. The government could not cross-examine him. Could not. And what we've suggested below, Your Honor, what we suggested below is that the way for the trial court to manage that sword shield problem is vis-a-vis Rule 403. And I'm here to suggest also via my way of a jury instruction. That is. What would the court balance? I understand the harm that you're seeking to avoid by preserving the privilege, but give me the factors that the trial court. Well, I suppose the trial court would balance the harm to the government in being unable to conduct a cross-examination, how important that evidence is to the case, the other types of things that the court would ordinarily balance. But your position would be in that case that even if he wasn't asked on cross-examination, the government wouldn't even be allowed to call Mr. or Ms. Keene to testify that they did have a conversation in which he put the briefcase. Correct. I correct. I do not think the government was permitted under the Speech or Debate Clause to elicit the testimony from Ms. Keene that elicited it. The other thing that I would suggest is possibly is a jury instruction. A jury instruction that says to the jury, you may take into account the fact that the congressman prevented, by virtue of his assertion of his privilege, prevented his own cross-examination. That would be like commenting on a Fifth Amendment right. Yes, the guy's silent, so I mean, we know you can't do that. This is not the Fifth Amendment, Your Honor. This is the Speech or Debate Clause. What do I do with the Helstovsky language suggesting that they're parallel? I don't think you give weight to it in light of the very clear language of Helstovsky that says the normal waiver rules do not apply in this context. We're not sure it can ever be waived. And third, if it can be waived, it can only be waived by an equivocal and explicit enunciation of a privilege. But it wasn't waived in that case. So that's, they held that issue open, but then they make a parallel with the Fifth Amendment. Are you saying we should just ignore that? Well, yes, I think you should in light of the facts of that case, Your Honor. Congressman Helstovsky testified 10 times to the grand jury. He voluntarily produced legislative records to the grand jury. His testimony concerned his legislative activities. If that doesn't satisfy the Fifth Amendment standard, I don't know what does. So in light of those facts. It did satisfy the Fifth Amendment standard. But it didn't satisfy the Speech or Debate Clause. In that case. I think your time has expired. Thank you. I very much thank you for the time. Thank you for the argument. Now I think Mr. Gashin, we're ready for you. Thank you, Your Honor. My name is Gary Yudishin. That's close enough. I apologize for butchering your last name. I'm sure it happens a lot. It happens every time I go anywhere. Your Honor, I do represent Mr. Sandlin. And Mr. Sandlin's position on this case, to put it in context, is really different than Mr. Renzi's position. Because the evidence in this trial was that Mr. Sandlin himself did not do anything illegal. He took no illegal acts. If he is guilty of anything, it's only assisting Mr. Renzi to commit the illegal acts that the government has claimed. But why doesn't that make him punishable as a principle? You've just described aiding and abetting. Well, I'm not saying that that fact alone has any effect. What I'm getting at is that he's guilty only if the government proves he is knowingly involved in the conspiracy with Mr. Renzi. But what do we do with all this evidence of, you know, pages of telephone conversations or telephone calls between the two, running scripts by witnesses, what to say to reporters? Planning stories that were contrary to what the evidence showed? Well, Your Honor, let me take those one by one, if I could. First of all, the main issue in this case is concealment. It's a question on the conspiracy as to whether or not there's concealment. Now, I'm not here to argue that Mr. Renzi didn't engage in concealment. But Mr. Sandlin did not engage in concealment. And there's evidence that he was telling people. For instance, he told the RCC people, the Hegner people, when they were initially negotiating, that he described Renzi as his partner, as his business partner. He told them he had had prior dealings and implied current business dealings with Renzi. This was at the same time that Renzi was apparently telling people he had no dealings with Sandlin. So, that shows they're on a different page. And in order to be in a con... But what about, I'm fixated on this conversation that he had after he was contacted, caught off guard by the press. And then essentially called and got instruction as to, you know, stick to this message. It was really the Nature Conservancy who suggested the Sandlin property that it wasn't Mr. Renzi. Okay. Your Honor, I understand that the fact is, is that it was the Nature Conservancy that was initially pushing the acquisition of Sandlin's property. So, what you're talking about is voicemails that were taped by Ares that Mr. Sandlin was leaving Ares voicemails and giving him information about this reporter. And the general, the most important thing that was said in those voicemails was that the Nature Conservancy was pushing the acquisition of the Sandlin land. That is, in fact, true. And I believe there were three or four witnesses from the Nature Conservancy who testified as government witnesses in the trial that described their longstanding interest in acquiring this land, both from Sandlin and from the previous owner of the land. So, that was, in fact, true. The problem I'm having with your argument is, viewing the evidence in the light most favorable to the verdict that the jury returned, they didn't buy your theory. Instead, they found a more sinister reason for those conversations to deflect the fact that it was Mr. Renzi who had been pushing the Ares group to purchase the property. And so, Mr. Ares was being instructed to lie to the reporter as to who the prime movers were behind the Sandlin property. Well, and your Honor, my response to that is, is that even if that is the interpretation of those voicemails that the jury put on them, that does not rise to the level of sufficient evidence. The context of those voicemails, in particular, were that it was this alternative newspaper. I believe it was called the Phoenix New Times. So, why did he write the check to Patriot Insurance Company rather than Rick Renzi individually as the terms of the promissory note should have dictated? Well, there's an email in evidence from Mr. Renzi's accountant, I believe, who instructed Mr. Sandlin to write the check as he wrote it. Did the check say that it was for a premium? No, and that's an important point because the government argues in their brief that there is a document that says that the $533,000 check was for an insurance premium to Patriot. That is a document that had a signature line for Mr. Sandlin and for his wife that neither one of them signed. And there is another document that's in evidence that we pointed out in our reply brief that is actually in Mr. Sandlin's own writing instructing that a check be made out to Patriot Insurance. But it doesn't say anything about it being for an insurance premium. That still doesn't satisfy me as to why on the payment of a personal promissory note for $800,000 that Aries, or excuse me, that Sandlin owes Renzi that Sandlin would write a check to an insurance company. Well, and that's... Yeah, I guess the thing is I'm sitting here listening, and you have to know that when you can discuss two different views of looking at something so much and go back and forth, that's a really difficult rock to push uphill for sufficiency of the evidence. And I understand and I agree, but the point that I'm making is these, like, for instance, the document that the government points to that says this is for an insurance premium, it doesn't affect the sufficiency because it's a document that had a signature line for Mr. Sandlin and he didn't sign it. So it seems inappropriate for the court to hold that as a piece of incriminating evidence when he didn't sign it. But then you pull each one out and you say this one's not right, this one's not right, this one's not right. Unfortunately, they're all there and they're all entitled to both circumstances, you know, you can look at them circumstantially and directly, and everything that Judge Tallman is arguing, it, you know, it defeats insufficiency of the evidence. Well, Your Honor, I do not believe... I know you can't concede that. No, I'm not. Tell it. It's like in summary judgment when you have to explain why too many things are not material issues of fact, that you kind of say, like, you know what, this probably isn't appropriate for summary judgment. And the problem with that is from the evidentiary standpoint on this case is that everything the government cites as their evidence to support the verdict, it's not just that we're quibbling with it and it's not just that it's subject to different interpretations. It doesn't support what the government claims it supports. So it's different. This is not a case where you have different interpretations. The fact that the checks were made out, that like one check was made out to Patriot Insurance, another check was made out to Renzi Vino. Both companies clearly in the public domain identified with Renzi. Everybody knows Patriot Insurance is Renzi. And they didn't either, but then Mr. Renzi didn't either claim them as he didn't claim them, and so that also can be considered relative to these, right? That's an alternate argument about why they would have done it that way to hide it. Well, and I am asking the court to distinguish between Sandlin and Renzi. And whether Renzi did something wrong... But it's a conspiracy charge. But there's no proof that Sandlin is engaged in the conspiracy with Renzi. Writing checks to an insurance company or to a wine company when it's supposed to be the repayment of a personal promissory note and the jury convicts on money laundering as well as conspiracy, why don't we look at the entire record of all the evidence that was before the jury and do what Judge Callahan was suggesting and ask whether a reasonable juror when faced with this evidence could conclude that Mr. Sandlin was aiding and abetting all of Renzi's activities. Well, for instance, in particular on the writing of the checks, that is a fact that is only significant if it's done to hide the fact that Sandlin is writing a check to Renzi. If he wrote a check to some company name that had nothing to do with Renzi, then it would be hiding the fact that he was giving money to Renzi. Patriot Insurance Agency doesn't say Renzi in it. I mean, I guess the question is how deep you have to dig in order to discover Mr. Renzi's connection, but I'm not sure that's a defense to money laundering. Well, and our response to how deep you have to dig is you don't have to dig deep at all. I mean, Renzi is Patriot... But that doesn't mean it's not fraudulent. The problem I'm having with your argument is that we've got to look at the evidence in total and ask ourselves whether a reasonable under the Jackson versus Virginia standard, whether this is sufficient. And I understand why you want to look at individual pieces of evidence and jettison them one at a time, but I don't think that's the analysis that we apply. Well, Your Honor, we have argued that each individual piece of evidence doesn't support the verdict. I think you've argued that well, but I have to ask you another question because you are such a good arguer. Now, let's assume that Renzi is successful in his argument with this court about the speech and debate clause. What's your best argument that your client, who doesn't have that privilege, gets to ride on the coattails and gets his conviction vacated? Well, Your Honor, my understanding of the speech and debate clause, as it applies to Renzi, is that if the speech and debate clause argument that Renzi's making is correct, that evidence was not admissible in this trial as to either defendant. And even if Sandlin was tried separately, that evidence would not be admissible because it's a privilege that Renzi had that he wouldn't... But if Sandlin were tried separately, how does he assert that privilege if Renzi didn't assert it? Well, I guess that's making an assumption that Renzi wouldn't assert a privilege that he is and has consistently asserted. But your argument is a spillover argument that really, that it shouldn't have come in as against Renzi, but because it did, it tainted Sandlin. Well, it shouldn't have come in against Sandlin either. What you're saying, Your Honor, is part of our argument. That's the coattail question. Because it does seem like he is trying to ride on the congressman's coattail, and he's not a congressman, and he's not a staff member. So in other privileges, you can't, a third party can't assert somebody else's Fourth Amendment or Fifth Amendment privilege. So why would this be different? Well, Your Honor, if this is a privilege that Renzi had, and the government wanted to call Joanne Keene to testify, then these particular questions, she would not have been allowed to testify as to those questions, because it's Renzi's privilege, and he wasn't waiving it. And that's true regardless of whether Sandlin's being tried by himself or not. So it's not really a question of Sandlin doesn't assert the privilege. Renzi asserts the privilege. And I don't think you can draw any conclusion from the facts and history of this case that Renzi would not have asserted the privilege in a trial of Sandlin. If the trials had been severed, how would Mr. Renzi assert the privilege in Mr. Sandlin's trial? How would that work? Well, I suppose it's the same way that Congressman Colby's office asserted the privilege in this case, where I believe, as I understand the facts, is that Mr. Renzi's defense was trying to present some evidence from Congressman Colby's office that the court excluded because Congressman Colby had asserted a privilege. So it would be the exact same situation with the privilege being asserted by Congressman Renzi. Okay. Thank you. You have gone over, but thank you. Yeah. Mr. Udishin. All right. Let's hear from the United States. You don't have very many people on your side of the table. As we were discussing that earlier, trying to make it look uneven. May it please the Court, I'm Stephen A. Stryker on behalf of the United States. I'd like to start, if I might, with the questions about a thing of value in this case. And Mr. Renzi correctly points out that we don't have a case that's directly on point. We think it's incumbent on him to come up with a case where the proposition is so novel. The proposition in this case is that the money that Mr. Sandlin received and that the money that Mr. Sandlin then passed on to Mr. Renzi had no value. It was not property. And I actually think that one of the failures, we think, of Mr. Renzi's brief is that it doesn't come to grips with the Hobbs Act, with the text of the Hobbs Act, which refers to property. We don't think there's the circumstances of this case or the circumstances of any other extortion case we can really imagine where money suddenly becomes not property because you're paying fair market value for something. And if I might combat some of the hypotheticals with a hypothetical of our own, if I go to my neighbor and I say, my house is worth a million dollars. I have an appraisal right here that says it's worth a million dollars. And I put a gun to his head and say, pay me a million dollars for my property because I need a million dollars right now. That might be a fair market value exchange, but that is classic extortion. That money, at a minimum, that money is property. And it is a thing of value because I need that money right now in that hypothetical. So for those reasons, we think it's incumbent on him to come up with the cases. We think the cases we've cited are- So what is this thing of value here? It seems like you have a little bit of a moving target here. You've come up with several things of value. Well, I think the variation to the extent there is any is within the indictment. As I think Your Honors pointed out earlier, the indictment is fairly general in that allegation at page 429 of Mr. Renzi's record excerpts. The indictment says that Sanlin was being enriched by this. Mr. Renzi was self-healing by this by virtue of the debt that Mr. Sanlin owed Renzi. Ultimately, this was money. It was $4.5 million to Mr. Sanlin. Actually, it was more than that. It was $4.7253 or whatever it was with the interest and with the extension of closing fee. So this isn't a new theory. Encapsulated within the money that Sanlin received was this extra $253,000. And, you know, encapsulated within the fact that Mr. Renzi received a payment in May of 2005, two and a half years early, or actually- But he was owed the money. It was the money. So the thing of value is that he got the money early and he might never have gotten it because you never know if anyone's going to pay him back? That's exactly right. And, actually, there is some-the early repayment having value to Mr. Renzi is actually alleged in the indictment as well. On that same page, it says Mr. Renzi wanted a cash infusion in 2005. His conduct in this case is perfectly consistent with that, and that's-the government emphasized that fact. You can see it- Your theory was that that's one of the reasons why he was misappropriating insurance proceeds in order to fund his political campaign. No, because they were two separate- We weren't saying that anything in 2003-the 2002 to 2003 insurance scheme- I thought the money went from the insurance company into the Renzi for Congress campaign fund. It did. We were just-I was just saying that the $4.5 million didn't have anything to do with the insurance. But, I mean, I thought your theory throughout was that he had this continuing need for cash, and he's coming up short because he doesn't have enough money in the insurance business to- And the jury could consider the testimony from Ms. Gamble, and I think that the RENZI bookkeeper was Kimberly Kepler. They both testified that in 2002 and-actually, and throughout, RENZI was always in financial straits. Pardon me. So, we think actually the cases we've cited, the Gorman case, for example, the defendant made a fair market value argument there. He said, you know, I took out this loan. I paid it back with interest. That's a zero-sum sort of a thing. And the Sixth Circuit said, that's not really what you look at. You look at the subjective value to this particular defendant. And this had value to this particular defendant in the Gorman case. If it can cloud the defendant's judgment in a way that he's acting in his own interests instead of the public's interest, that's what we want. We don't want to blow a hole in the statute that's going to, you know, that's going to allow these sorts of accomplishments. But things could be wrong, and there isn't always-they don't always fit. I mean, we know that. I mean, it can smell like a big pile of guano, and it's like it doesn't look right. We don't want people doing that and all of that. But it doesn't mean you can shoehorn it into a particular charge. I mean, honest services is an example of where there are things that people did something wrong, and then the Supreme Court, you know, came out with situations that ended up having a number of cases reversed. We acknowledge that's a fair point. But in this case, it sort of blinks reality to say that money isn't property. And as I think Your Honor's questioned before, you know, the Ares group, the RCC group, they didn't want this property for their own. They would not have bought this property otherwise. And that's the question under Evans. Under the Evans case is, was the defendant entitled to the money? Was he entitled to the property? If the Supreme Court said you were wrong, let's say he agreed with you, but then the Supreme Court reversed it, what would be left, I mean, after that? Well, what would be left is the $253,000. I mean, we don't think now we disagree, of course, that a fair market value exchange can't be a crime. But the $253,000 is extra. I mean, under any view of the evidence, that was solely because of the extortion. Mr. Sandlin had the Ares group over a barrel and was able to insist on onerous terms, as Ares put it, precisely because of Mr. Renzi's position in Congress and precisely because of their relationship and the money that Mr. Sandlin owed Renzi. So we think that that is enough. We think that that was fairly alleged in the indictment because it's included within the money that's alleged there. It was, in our theory, as far as the variance idea, well, there are a couple points to make about the variance instructional argument. The first is that it's not a point that Mr. Renzi made below. He did, in his extortion instruction, propose $733,000 as the property at issue. In his honest services instruction, he didn't even propose that. He didn't propose that as a thing of value. So under any, even under Rule 30D, under his reading of Rule 30D, which is that you don't need a specific objection as long as you proposed an instruction, his honest services challenge would still fail because, or at least would be subject to a plain error standard. And in any event, under Rule 30D, Rule 30D does require a specific instruction. The text of Rule 30D is you must make a specific objection to the failure to give a requested instruction. And the Supreme Court's decision in Jones that we cited in our brief, we think, is perfectly on point on this. You don't want a district court having to sort of guess at which instructions the defendant is still seeking. You should make specific objections to streamline the process and streamline the claims of error. If I might turn then to, unless the Court has further questions about thing of value, I might turn to the speech or debate clause. Before you do that, because I think I'll take up the rest of your time, could you address the insurance violation question? As a matter of state law, which I assume is the body of law we're looking at, what was the evidence in the record that Mr. Renzi was an agent of the insured or otherwise in the insurance business? I only saw evidence of him being a broker, which the Arizona courts say is not an agent of the insurance company. Right. We didn't offer any evidence about specifically what the state law said on this. And it wasn't really, I don't think the state law question was really presented in the pleadings. And I think we should have been clearer about this in our brief. There are actually three ways to satisfy the statute. One of them is to show that Renzi was an agent of Safeco. But the way that business of insurance is defined in the statute, it's first defined as, and again, we weren't clear enough about this in our brief, acts incidental to the writing of insurance can also be the business of insurance. And we don't think that that's tied to being an agent of an insurance company. So it's not really, you're looking at the statute and how the statute defines it, not what state law says. I think that's right. Is that your best argument? It is. It is our best argument. And I think the cases that we cited in our brief, the Peterson case, the Siegel case, and the Netco versus Beamer, actually it's Beamer versus Netco. Especially, of course, there isn't a lot of law in this area, and so I'm relying on a district court decision that's not precedential. But the Beamer case actually really does a good job of demonstrating you don't need agency. And actually, to turn back to your question first, as far as what the evidence was of agency, there was evidence that Renzi was an agent of Safeco, and that's at, and this isn't in our record excerpts, but if you look at the fourth day of the trial transcript at page 119, Gordon Phelps, who is a manager at Safeco, testifies that Renzi was an appointed agent of Safeco. That point was not developed thoroughly there. There is a point developed though thoroughly in our record excerpts at pages 84 to 95 of our record excerpts. Those pages say, again, this is Gordon Phelps testifying about the interrelationship between these three entities, Safeco, NIF, Renzi. Those three entities, you know, essentially NIF was the middleman. RNC sold Safeco insurance, marketed Safeco insurance, and was, pardon me, required under the brokerage agreement to pass on premiums to NIF, which then passed them on to Safeco. So we. The brokerage agreement says we agree you're not an agent of NIF. True. And that's, of course, the worst fact for us, but we also think that the way the statute is worded business of insurance, it's worded as acting as an agent. We think the breadth of that language is it sort of just suggests are you authorized to act on behalf of someone? The state court says the insurance company has appointed you. I didn't see the appointed agent language. I just saw he refers to them as an agent, but he's describing the activities of a broker, so I didn't see that as being helpful. Well, and there's actually, and the third way is, again, the way the statute is worded in terms of business of insurance, it says the business of insurance can be the acts of an agent of an insurer or people who are authorized to act on behalf of an agent of an insurer. So there's this sort of layering. So if you read this, it per se covers all insurance brokers. We think that it probably does, yes. So that's your reading. Yeah, I mean, our reading is it blinks reality to think that Mr. Renzi owned an insurance agent or ran an insurance business and it wasn't engaged in the business of insurance. I mean, the testimony of Ms. Gamble at page 32 of our record excerpts is that she, you know, RNC and she on behalf of RNC quoted insurance prices. She bound clients to insurance policies. She issued certificates of insurance. That seems to us as the business of insurance. Now, we acknowledge that there's this, and it's kind of Congress defined this in a very indirect way, to define things through the lens of an insurer rather than just people engaged in the business of insurance. But that phrase acts incidental to the writing of insurance seems to us very broad, and it seems to the Second Circuit in the Peterson case is very broad because if you're acting as an agent, even totally without authorization, which is, so even assuming that brokerage agreement was somehow otherwise was, you know, somehow devastating to us, you don't have to, RNC didn't have to have authorization. They just could act as. They could, you know, pretend to be. And, in fact, they pretended to be, you know, as far as the gym core insurance company, they're issuing certificates of the gym core insurance company, which doesn't exist, but they're pretending to offer insurance through them. That's engaged in the business of insurance under the Peterson case, even though, again, this is without any authority. So unless there are further questions about business of insurance, I would turn back to the speech or debate clause questions. We would start with the idea that, and I think our strongest point on this, and Mr. Renzi's weakest, is the point that, and you can frame this as harmless error. You can frame it as he wasn't questioned because the verdict was not effective. But we think the evidence in this case, as your honors went through with Mr. Sandlin's counsel, the evidence in this case is powerful of a conspiracy. It was powerful that whatever Mr. Renzi, even assuming Mr. Renzi had some sort of mixed motive, even assuming he was trying to benefit the fort in various ways, there can be no question on this evidence, and he never really comes to grips with some of the documents that you were mentioning. There can be no question that he was self-dealing. He wanted to be repaid. Do you concede that at least the information that King testified about the delay because of the prosecution of Duke Cunningham is covered by the speech or debate clause? I ask this because there's language in Hilstoski and in the prior opinion in this case that when legislation hasn't yet been enacted, promise to do something in the future, negotiations about these issues in the future, are not speech or debate covered by the clause. So given that the Aries Bill, I think, was never enacted, why is this covered by the speech or debate clause? We think it's not. We think that that probably is the most important fact. By the way, the same can be said, I think, of the RCC. To the extent that there was a conversation at all about seeming disinterested in the RCC exchange, much the same can be said. The RCC bill, such as it was, was only ever introduced in May of 2005, which was after this conversation. So these are embryonic private negotiations at this point. To the extent that there was any bill at the time of these conversations, they were discussion bills passed between Mr. Renzi and private parties. So we do think that's right. And we would add, and there's almost sort of a totality of circumstances because there are other, you know, part of Renzi 1 is that Brewster doesn't foreclose anything that has some facial validity. Putting the brakes on the Aries exchange and under other circumstances might have some facial validity, and it might be, you know, sort of tangentially related to the legislative process. But in this particular case, it was clear that this was Mr. Renzi covering up a corrupt promise that he had already made. So, of course, we don't concede the point. But we do think there's the simplest way to resolve this case is simply to say under any view of this feature debate clause, the narrowest way to resolve this case is under any view of this feature debate clause, because the evidence of Mr. Renzi's guilt was overwhelming the government. But if it's structural error, that doesn't work. I think that's right. Well, it does. It still works. It still works. Structural error entitles someone to a reversal. It's such a bad error that you don't get to make that argument. And I think that's the way the Swindle Court treated it was as structural error. The Swindle Court said this couldn't be harmless error. But before you get to the question of harmlessness would be or to structural error would be was there an error at all. Saying something couldn't be harmless error can be saying it was so prejudicial. But once you say something is structural error and you elevate it to that, then you just don't even ever get to that discussion. And there shouldn't be a lot of structural errors, obviously, because people make mistakes about every three seconds in a trial. And agreed about the structural error point, there's just no point that it would be per se reversible if there were an error. If that were the approach the court were to take, we would say there was no error because he wasn't questioned within the meaning of swindle or within the meaning of doubting. Those cases stand for the proposition that a member isn't questioned where there's nothing more than a slight likelihood that the jury relied on that particular evidence. And we think that Renzi 1 actually is a good analogous authority from the grand jury context. In Renzi 1, the government inadvertently offered legislative act evidence in the grand jury. But it didn't expose Mr. Renzi to liability. It wasn't what caused the grand jury to indict. Mr. Renzi offers a really good reason to treat the questioning inquiry differently for these purposes as far as whether it goes to the indictment or whether it goes to the conviction at trial. So we think under any standard, and if it's, you know, treated as the swindle case, which is if you're not relying on the evidence, it's not questioning and therefore no error, or if you're treating it as a harmless error type of inquiry, we think under any standard the evidence would be overwhelming enough. And more to the point, the government didn't, Mr. Renzi makes this point that we relied so heavily on this alleged legislative act testimony. The RCC seeming disinterested conversation to the extent it was a conversation, we didn't rely on that at all. And it's not even particularly inculpatory. I think it's the point of that seeming disinterested in the RCC exchange at that point, if he seemed disinterested in it because the sand on tracks had fallen out by that point, he could very well have been, under his view of the evidence, he could simply argue, well, obviously I was disinterested in it at that point because I wanted the sand on tracks included so that it would help the court. So it's hard to see how that piece could have affected the outcome of the trial at all. Well, let's just assume for argument's sake, and I'm just, that we were to find that it was error and that it's structural error. How does that affect the co-defendant? He, I made the point, you seem to want to ride on the, you know, the coattails, even though it's not your privilege. So what's your argument on that? Well, I think, and in response to the question of, I think Your Honor is asking, asked Mr. Sam with counsel the question, what's your best argument? His best argument is, well, that evidence would not have been admitted as to me just because I would have been able to ride on the coattails. I don't think we disagree that it wouldn't have been, I mean, if assuming this is legislative act evidence, couldn't have been offered, was prohibited, I doubt there's any curative instruction that could have been offered so that it could have been admitted to one. Well, I guess, let's say it wouldn't have been admitted as to him. Does he get to claim structural error when he is not the privilege holder? He cannot assert, he cannot seek a new trial on the basis of Mr. Renzi's legislative privilege under any theory. Well, of course you have to say that, but why? And the reason why is for the reasons we've offered in our brief. The leading case on this would be, first of all, Gravel, which Gravel says the Speech or Debate Clause, the legislative privilege is invocable only by the member. The underlying reason for that, which I'm not sure that Gravel really got into, but other cases do, the point of the Speech or Debate Clause as a structural matter is to ensure the legislative independence of individual members. Mr. Sandlin? So technically you're saying that Renzi could, if he were successful, could make a structural error argument and get reversal, but that Sandlin could not and so the evidence, you take that evidence out and you look at it and decide would he have been convicted anyway? And you can do a harmless error analysis on him? I mean, is the only structural error as to the privilege holder and anyone else? I don't think, well, first of all, yeah, I think that's right. I don't have an answer. I mean, I don't have a case exactly. I'm sorry. We would strongly resist the structural error point in the first instance. But beyond that, we would agree that assuming there was a structural error as to Mr. Renzi, there could be no error, let alone structural error, as to Mr. Sandlin. That argument just doesn't resonate with me very well in a conspiracy case where maybe that was the strongest piece of evidence that the jury relied on in determining that there was an illegal agreement as between the two men, which Sandlin aided and helped to conspire with Renzi over. And if we were to declare that it was structural error to introduce that evidence against Renzi, why wouldn't we also order a retrial as to Sandlin? Well, a couple points. The first one is that when you're talking about a conspiracy, I mean, the Padilla case in the Supreme Court in the Fourth Amendment context was a Padilla case. It was a, excuse me, a coattail type of a case, and it was a conspiracy case. And in that case, the Supreme Court said just because this other, the defendant himself, wouldn't have had this evidence offered against him just because he could have ridden the coattails, as it were, that's not enough for us to confer standing on him and for him to be able to vicariously assert the reasonable expectations of privacy that some other defendant might have. So we don't think that the, we don't think that's featured. Privilege is a privilege against the introduction of any evidence at all. And the evidence is introduced in a RICO conspiracy against all of the co-conspirators, and we conclude that that was structural error. I just, I'm having a hard time understanding why the error wouldn't also inure to the benefit of everybody else who got convicted on the same evidence. Well, again, I mean, I guess I'm three times removed from what our argument would actually be because we don't, we just don't think that structural error analysis is an appropriate thing. We understand your point. And we appreciate, I hope you all appreciate, we're trying to understand what the consequences are going to be whether we rule for one side or the other. And I just want to make sure we tease this out far enough so that I know what I'm doing here, whatever way I go. We just don't see any argument that Mr. Sandlin's offered to treat the legislative privilege any different for these purposes than any other privilege. I mean, the attorney-client privilege, the Fifth Amendment right against self-incrimination, Miranda, all of those, as trial rights, and those privileges don't seem to operate that much differently than the speech or debate clause does. So we think that the analysis that's used in the cases we studied in our brief, particularly the Padilla case, we don't see, certainly Mr. Sandlin doesn't offer any persuasive reason why you would treat the speech or debate clause differently. And in any event, I think, Judge Tallman, you asked about this being strong evidence of conspiracy. This really doesn't go to the heart of the conspiracy at all. This idea that Mr. Renzi wanted to put the brakes on the Aries Exchange because of Duke Cunningham, I mean, it does go to his intent. It doesn't even really actually go to Mr. Sandlin's intent very well. And I think, again, if there is a harmless error analysis to this, it would be even less prejudicial to Mr. Sandlin than it was to Mr. Renzi. But if the jury bought, and apparently they did through their verdict, that that was why he put the brakes on the bill, and then Sandlin was instructed, when you get inquiries from the press, tell them it wasn't Renzi who was pushing the Sandlin deal, it was the Nature Conservancy, it all seems to be intertwined. Well, but again, I would say that that evidence, especially those evidence of the October 2006 phone calls, those are particularly devastating because they do loop in both defendants, they loop in their conversations. I mean, there are nine, actually I think 11 conversations between the two of them at the same time as these conversations that Mr. Aries is having with Sandlin. And to respond to Mr. Sandlin's points about sort of the, whether what he was saying to Mr. Aries was true, we don't think that that holds water because, for one thing, Mr. Sandlin specifically, explicitly told Aries to deny that Renzi had conditioned the land exchange on the Aries Group's purchase of this property. So that, and clearly, I mean, the central discussion in this case, the April 15th meeting alone, refused that. There was no doubt, and I don't think it was ever really disputed, actually. I mean, for present purposes it's not disputed that this promise of a free pass was made. So, and really that's what, you know, that's really what so much of the claims that Mr. Renzi is making on appeal, so much of it goes to what we think are sort of side matters. I mean, the Pugh claim, for example, seems to go to the side matter of whether Mr. Aries, and I'm not saying this wasn't important to the trial, I'm just saying it wasn't really all that disputed. The idea that Mr. Renzi wasn't pushing this land onto Mr. Aries, clearly he was. And clearly there was independent evidence of that, totally apart from the testimony that Mr. Renzi challenges on the Pugh grounds. And the phone records themselves show it. The phone records show that the moment that, and the government apologizes for missing this call on April 14th that occurred, and that's why this, that's why we're here discussing this claim at all. If the government hadn't, you know, had researched the phone records better, we would have noticed this call. But it's actually, it doesn't really exculpate Mr. Renzi in any way, because as soon as Mr. Aries and Sanlin got off the phone on April 14th, the first person that Mr., I'm not sure if it's Sanlin called Renzi or the other way around, but they clearly had a discussion right after that. Clearly they're discussing, you know, here's what we're going to do in this deal. Here's how we're going to, you know, here's how we're going to good cop, bad cop Mr. Aries. And we think that Mr. Aries' testimony on that point is actually very powerful. So I think that's our mainline response to the Pugh claim. I know there's so many issues in this case. I'm not sure to where to turn next. If your honors have specific questions about any specific issue, I would be happy to address them. I don't think I have anything more. I think not. Okay. You've still got seven minutes, but we're always happy when counsel relinquishes time. We would rest on our brief absent further questions. All right. Thank you very much. I did let everybody go over, but in fairness, I think I'll give Mr. Hemelfarb, I'll give you a couple minutes in rebuttal. Thank you. Thank you. Just to begin with the thing of value, when my friend, Mr. Estreicher, first stood up here, the first thing he said was that it was incumbent upon the defendant to come up with a case, and this was a novel proposition to us. This gets things exactly backwards. The whole point of the rule of lenity is that if there's any doubt, any question about whether a criminal statute reaches particular conduct, the doubt gets resolved in front of the defendant, not the government. And this isn't, you know, some rule that's some argument that gets tacked on at the end and it's the last refuge of him who lacks any serious argument. The rule of lenity is taken extremely seriously by the Supreme Court in recent years, and most pertinently here, it's been taken seriously in honest services cases in McNally. It relied on the rule of lenity and holding that property doesn't include honest services. Then after Congress enacted 1346 just a few years ago, it decided skilling and relied on the rule of lenity and holding that honest services fraud is limited to bribery and kickbacks. We would say precisely the same thing about equal value exchanges. And speaking of skilling, Mr. Estreicher said, well, this has to be extortion, it has to be bribery, because in his words, this sort of thing can cloud the judgment of a public official. Well, that was precisely their theory before skilling was decided, that there was a conflict of interest that clouded Renzi's judgment. But, of course, that can't be their theory and isn't their theory anymore after skilling. So to say that this proves that this could cloud the judgment proves only that you've got a conflict of interest, not that you've got bribery or extortion. On the early repayment, all I would say is what we said in our reply brief, is that this was an interest-bearing loan. It was not an interest-free loan. So the early repayment deprived Mr. Renzi of money he would otherwise be entitled to. So that's not proof of more than an equal value exchange. As far as the Gorman and related cases are concerned, those cases do involve favorable loan terms, which is why there was a thing of value there, very much unlike this case. Thank you, Mr. Himmelfarb. Your time has expired. Yeah, just a minute. Let's see. Mr. Utterson. Okay. All right. And then with due respect to Congress, Mr. Kercher, any final thought? Go right ahead. Briefly, on the point of whether the testimony elicited from Joanne Keene was legislative or not, I think what I would point the court to specifically is language in Renzi 1 on page 1031. This is the part of the opinion where you dealt with the grand jury evidence. And you specifically referred to a document, I believe it was an email, an RCC email, that referred to, quote, unquote, actual legislation as being legislative protected, therefore should not have been admitted before the grand jury. What Ms. Keene is talking about here is exactly the same thing, actual legislation. Both the RCC bill and the Ares bill were in draft form at that point when those two conversations took place. Draft form, but not yet actually dropped in the hopper, right? They had not been formally introduced? Well, yes. And I do not have access to the emails. I saw the argument, I think it was, in Mr. Renzi's brief. Maybe you referenced it, too, that a draft had been left with, is it legislative council, who takes a look at it before it's formally introduced? No, legislative council is the house body that actually drafts the legislation. And that occurred in March, as I recall. I believe it was to the RCC bill. It was in March. The conversation with Ms. Keene was right thereafter. But the question is, is that future proposed legislation? It's certainly not pending legislation. I don't think it matters, Your Honor, because what we're talking about here is Ms. Keene talking about, not promises to anyone, he's talking about Congressman Renzi's motivation, intent, support for those bills. He's making the decision. But we still have to decide when it becomes pending versus future legislation, do we not? Well, not in the House's view, right? We're talking, again. Well, esoterically, at what point in time does legislation then spring into existence? If you're thinking about it, then that's good enough? Well, I don't think so. With that respect, Your Honor, I refer you to the Eastland case, which threw out a civil suit, to be sure, but threw out a civil suit on speech or debate grounds where there was no legislation, draft, pending, or otherwise. Right? That was at the investigative stage. No legislation had been prepared. Suggesting to the Court that it's very dangerous to draw lines in the sand about when, these temporal lines in the sand. But if it's not a legislative act to, if it involves future legislation, we have to draw the line somewhere, do we not? I urge you to go back to Renzi 1 and look at the RCC memo, which you said referred to actual legislation, and see whether that was in the hopper or not at that point. We'll go back and look at it. Thank you very much. Thank you. The case just argued, well, let me just say this. We'll adjourn and talk to one another for a moment, and then let you know if we need further argument on the classified matters. So we'll stand and recess for a few minutes, and the clerk will let you.
judges: TALLMAN, CALLAHAN, IKUTA